UNITED STATES DISTRICT COURT
DISTRIC OF MASSACHUSETTS

| | |
|---|---|
| MARCELLA FRANCOIS, )<br>)<br>Complainant, )<br>)<br>v. )<br>)<br>CATHOLIC CHARITABLE BUREAU )<br>OF THE ARCHDIOCESE OF BOSTON, )<br>)<br>Respondent. ) | CIVIL ACTION NO. |

**COMPLAINT WITH DEMAND FOR JURY TRIAL**

**I. PRELIMINARY STATEMENT**

1. The Plaintiff, Marcella Francois, ("Ms. Francois or "the Plaintiff") brings this complaint against the Defendant Catholic Charitable Bureau of the Archdiocese of Boston Catholic Charities" or "the Defendant") for wrongful termination based, *inter alia*, on employment discrimination in violation of state and federal laws and regulations.  Ms. Francois' supervisor, Nyra Culbert Hall, treated Ms. Francois' blindness as a burden and an inconvenience, refused to provide reasonable accommodations, and fired her without sufficient cause and in violation of state and federal laws and regulation.  Ms. Francois' firing a discriminatory termination and was the final manifestation of the persistently hostile work environment she suffered during Ms. Hall's time employed by the Defendant.

**II. PARTIES**

11. The Plaintiff, Marcella Francois ("Ms. Francois"), is a resident of the Commonwealth of Massachusetts residing at 50 Seymour Street, Roslindale, Massachusetts, Suffolk County.

1

12. The Defendant, Catholic Charitable Bureau of the Archdiocese of Boston ("Catholic Charities"), is a non-profit organization with a principal place of business at 275 West Broadway, Boston, Massachusetts, Suffolk County.

13. Catholic Charities operates the Yawkey Child Care center ("Yawkey Center") at 185 Columbia Road, Dorchester, Massachusetts, Suffolk County.

### III. JURISDICTION

5. This Court has jurisdiction over this action pursuant to 28U.S.C.§1331, in that this is a civil action arising under federal laws: 42 U.S.C. §12117 which grants the Court subject matter jurisdiction over violations, *inter alia*, of the Americans with Disabilities Act ("ADA"); and 28 U.S.C. §1367, which grants the Court supplemental jurisdiction over state claims that are so related to the federal claims that are within the original jurisdiction that the state claims form part of the same case or controversy.

6. Personal jurisdiction and venue are appropriate pursuant to 28 U.S.C.§1391 because the Plaintiff resides in Suffolk County, Massachusetts; the Defendant has its principal place of business in Suffolk County, Massachusetts; and the unlawful conduct complained of occurred in this District.

### IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

7. The Plaintiff timely filed a Complaint ("MCAD Complaint") with the Massachusetts Commission Against Discrimination ("MCAD") and the MCAD timely dual filed the MCAD Complaint with the Equal Employment Opportunity Commission ("EEOC").

8. The MCAD determined that there was insufficient evidence to support a determination of probable cause and dismissed the MCAD Complaint on March 31, 2022; thus, the MCAD Complaint is no longer pending before the MCAD. (See Exhibit 1).

9. The EEOC has issued a Right to Sue letter a copy of which is attached. (See Exhibit 2).

10. The Plaintiff timely exhausted all state and federal administrative requirements.

## V. FACTS

Background on Ms. Francois' Career at the Yawkey Center

11. From September 1998 to September 2019, Ms. Francois was employed at the Yawkey Center as a pre-school teacher.

12. Throughout her tenure at the Yawkey Center, Ms. Francois consistently received exemplary performance reviews from her supervisors, who described her as dedicated, responsible, warm, and reliable.

13. Over a twenty-year period, supervisors, parents, and coworkers repeatedly complimented the genuine love and respect Ms. Francois displayed towards the children in her care.

14. Ms. Francois was especially well-regarded for the affection and patience she provided to children struggling with emotional problems or who otherwise required special attention.

15. Ms. Francois suffers from several eye-related conditions, including severe glaucoma, cornea problems, cataracts, and retina problems.

16. Ms. Francois became registered as legally blind in August 2014 and has received a Certificate of Blindness from the Massachusetts Commission for the Blind ("Commission for the Blind").

17. After Ms. Francois was certified as legally blind, the Commission for the Blind visited the Yawkey Center to install a computer system that would allow her to use the computers more comfortably.

18. The Commission for the Blind was unable to install the computer system because the Yawkey Center's computers were too old for the software.

19. Because of this failure to install the computer system, the Commission for the Blind informed the Yawkey Center it would need to provide Ms. Francois with appropriate accommodations for her disability, including, but not limited to, assistants to help her with computer tasks, extra time to complete work assignments, etc.

<u>New Management Creates a Hostile Work Environment at the Yawkey Center</u>

20. Nyra Culbert Hall ("Ms. Hall") became Director of Child Care Services at the Yawkey Center in August 2018.

21. As Director of Child Care Services, Ms. Hall was in direct contact with the Catholic Charities Human Resources Department ("HR"), and therefore knew or should have known about Ms. Francois' disability and her need for reasonable accommodations.

22. In addition to the report from the Commission for the Blind requiring Ms. Francois be provided accommodations related to computers and other work tasks, Ms. Francois also provided HR with a letter from her doctor noting that she needed to leave work early, around 2:30 or 3:00 p.m., so she could safely navigate home.

23. Ms. Hall failed to provide Ms. Francois with the reasonable accommodations recommended by the Commission for the Blind and Ms. Francois' doctor.

24. Ms. Hall's treatment of Ms. Francois contrasted with that of her previous supervisors, who had provided her with accommodations for her disability and treated her with respect.

25. Ms. Hall frequently requested that Ms. Francois work late hours, often until 5:30 or 6:00 p.m., requiring Ms. Francois to navigate home in the dark and putting her safety at risk.

26. Ms. Francois, due to her strong work ethic and pressure from Ms. Hall, complied with these requests to work late hours despite the risk to her safety.

27. Ms. Hall also instituted a policy requiring some teachers to fill out clipboards when the children arrived for class each day.

28. Some other teacher, who were not disabled, were not required by Ms. Hall to fill out the daily clipboards.

29. Ms. Francois had difficulty reading the small print on the clipboard's pages and requested the pages be printed in larger font.

30. Ms. Hall failed to print the clipboards in a larger font to accommodate Ms. Francois' disability.

31. On one occasion, Ms. Hall instructed Ms. Francois to lead her classroom, with her co-teachers and a handful of teenaged volunteers, on a field trip to the Franklin Park Zoo, requiring a half-mile walk each way down the busy Columbia Road with several major intersections along the route.

32. Ms. Francois informed Ms. Hall that she was uncomfortable leading her students on the trip to the zoo, and that she was worried about the safety of the children because her disability would make it challenging to supervise them and because several of the children had behavioral issues and required individual supervision.

33. Ms. Francois requested that Ms. Hall assign another adult staff member to walk with her, so she could more comfortably navigate her way to the zoo and supervise the children.

34. Ms. Hall refused to assign any additional adult staff to accompany Ms. Francois on the trip to the zoo.

35. Ms. Hall told Ms. Francois she "couldn't do it anymore."

36. Ms. Hall told Ms. Francois she would be fired if she did not take the children to the zoo as instructed.

DCF Holds Yawkey Center in Non-Compliance after Investigation of Child Neglect

37. In December 2018, Ms. Francois faced her first disciplinary action after over twenty years at the Yawkey Center.

38. On December 7, 2018, a play therapist filed a report of suspected child neglect under Mass Gen. Laws ch. 119, §51A (the "51A") after observing a child use the bathroom without being accompanied by a teacher, as well as two children fighting.

39. While the 51A was being investigated by the Department of Children and Families ("DCF"), Ms. Francois was suspended from work.

40. Ms. Hall made no attempt to discuss with Ms. Francois how her disability might have impacted how she understood or responded to the incident.

41. Instead, Ms. Hall accused Ms. Francois and her co-teacher, Adeola Adebagbo ("Ms. Adebagbo") of not being responsive to the children's needs.

42. The DCF investigation cleared Ms. Francois and Ms. Adebagbo of any individual wrongdoing, and also found that the Yawkey Center was not in compliance with the requirements set under the Boston Preschool Expansion Grant.

43. Despite the conclusion of the DCF investigation, Ms. Francois was temporarily suspended.

44. On December 31, 2018, Ms. Hall instructed her to sign a document labeled "Personnel File" (the "Personnel File Document").

45. The Personnel File Document was a two-page document printed in small, single-spaced font.

46. The Personnel File Document contained language blaming the Yawkey Center's non-compliance on Ms. Francois' conduct, detailing essential job responsibilities, and identifying areas of improvement for Ms. Francois to focus on.

47. At the bottom of the second page, the Personnel File Document also informed Ms. Francois that failure to improve her job performance could result in further disciplinary action or termination.

48. Ms. Francois was confused as to why she had to sign any paperwork after the DCF investigation cleared her of wrongdoing.

49. Ms. Francois requested that she be allowed to take the Personnel File Document to another room, since the intensity of the bright lights of the room she was in when Ms. Hall showed her the paperwork made it difficult for her to read.

50. Ms. Hall refused to allow Ms. Francois to read the Personnel File Document in another room.

51. Ms. Hall told Ms. Francois that the purpose of the Personnel File Document was simply to confirm they had discussed certain reforms that would be implemented following the DCF review.

52. Ms. Hall did not describe the Personnel File Document as a 'warning.'

53. Ms. Francois did not understand the Personnel File Document to be a 'warning.'

54. The lighting in the room made Ms. Francois' vision so poor that she was unable to sign her name on the indicated line in the document.  Her signature appears substantially below the line.

55. In January of 2019, while Ms. Francois was still on suspension, Ms. Hall told Mr. Rivera that she wanted to fire Ms. Francois.

The Terminating Incident

56. On August 28, 2019, Ms. Francois and her co-teacher, David Rivera ("Mr. Rivera"), took the seventeen children in their classroom outside to the playground for a thirty-minute recess.

57. On a typical day, Ms. Francois and Mr. Rivera would have been joined by a third teacher, Ms. Adebagbo.

58. However, the Yawkey Center was short-staffed due to several teachers leaving or being fired after Ms. Hall became Director, leaving Ms. Francois' classroom with only two teachers while Ms. Adebagbo substituted in a different classroom.

59. Five minutes before the end of recess, Ms. Francois and Mr. Rivera announced to the children that recess would be ending soon.

60. At the end of recess, Ms. Francois and Mr. Rivera lined the children up on a bench and conducted a headcount.

61. Ms. Francois and Mr. Rivera counted sixteen children on the bench, and saw the seventeenth child on the playground refusing to leave.

62. This child had a history of behavioral issues and often required additional attention.

63. Ms. Francois told the children to remain seated on the bench so she could speak with the child on the playground.

64. Ms. Francois walked back to the playground to tell the child to return to the group and come inside for recess.

65. While Ms. Francois was speaking with the child on the playground, Mr. Rivera unilaterally decided, without communicating to Ms. Francois, to bring some of the

children inside. This was not the standard procedure, which involved taking the entire group inside together.

66. Ms. Francois did her best to conduct another headcount, not knowing how many children Mr. Rivera had taken inside with him.

67. Ms. Francois counted five children on the bench, which along with the one she had retrieved from the playground made for a total of six.

68. Based on her headcount of six children, Ms. Francois concluded that Mr. Rivera had taken eleven children inside.

69. Ms. Francois took the six children back inside. On her way in, she looked through a window in the door to make sure there were no remaining children left outside.

70. Ms. Francois did not see any remaining children outside.

71. When Ms. Francois returned to the classroom with her group of six children, she found Mr. Rivera supervising the first group of students washing their hands.

72. Ms. Francois began setting up the tables for the children's next activity.

73. Once all the children had returned to their chairs, Ms. Francois realized that one of the chairs was empty.

74. Ms. Francois asked Mr. Rivera if the child was with him washing his hands, to which Mr. Rivera responded the child was not.

75. Ms. Francois asked Mr. Rivera to go quickly and find the child, after determining that he would able to search faster given her disability.

76. Mr. Rivera returned to the classroom shortly thereafter and informed Ms. Francois that the child was with Ms. Hall.

77. Ms. Francois briefly spoke with Ms. Hall in her office at the end of the day.

78. Ms. Francois asked Ms. Hall what she should do next.

79. Ms. Hall told Ms. Francois, "you know the drill."

80. Ms. Francois interpreted "you know the drill" to mean she should go home.

81. Ms. Francois did not interpret "you know the drill" to mean she had been terminated, or that her job was in danger of termination.

82. Ms. Francois was suspended without pay following the incident.

83. On September 9, 2019, Ms. Hall called Ms. Francois to inform her she and Mr. Rivera were both being terminated.

84. The stated basis for Ms. Francois' termination was the August 2019 incident and the 'warning' following the December 2018 incident.

85. This call was the first time Ms. Francois had heard the Personnel File Document referred to as a 'warning.'

## VI. CLAIMS FOR RELIEF

**FIRST CLAIM: DISABILITY DISCRIMINATIN IN VIOLATION OF THE AMERICAN OF THE AMERICANS WITH DISABILITIES ACT, AS AMENDED, AND OTHER FEDERAL LAWS AND REGULATIONS.**

86. Paragraphs 1 through 85 above of this Complaint are repeated and incorporated in this First Claim as if fully set forth herein.

87. The Plaintiff is and was at all relevant times qualified to perform the essential functions of the position for which she was employed.

88. The Plaintiff is and was, at all relevant times, a qualified individual with a disability as defined in the ADA Amendments Act of 2008 ("ADAAA") 42 U.S.C. §12102 *et seq.* and/or the Defendant, through its agents, servants, and employees regarded the Plaintiff as having such an impairment as defined in 42 U.S.C. §12102 *et seq.*

89. The Defendant's conduct, through its agents, servants, and employees, violated the Plaintiff's rights under 42 U.S.C. §12101 *et seq*. and under other federal laws and regulations.

90. The Defendant violated the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq*., and other federal laws and regulations, when it: wrongfully terminated the Plaintiff from her position on the basis of her disability or perceived disability; failed to provide reasonable accommodations; and subjected the Plaintiff to a hostile work environment.

91. As a direct and proximate result of the Defendant's violations of the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq*., and other federal laws and regulations, the Plaintiff has incurred and continues to incur monetary damages including, but not limited to: loss of back and front wages; loss of earning capacity; loss of fringe benefits and pension and retirement benefits; emotional distress; pain and suffering; loss of enjoyment of life; and mental anguish.

WHEREFORE, the Plaintiff requests that this Court award the Plaintiff damages for the Defendant's violations as stated in this First Claim, as follows:

i. Award the Plaintiff actual damages, including wages (back and front), salary, raises, cost of health insurance, seniority, vacation time, and other benefits lost;

ii. Award the Plaintiff monetary damages for emotional distress, pain and suffering, mental anguish, and loss of enjoyment of life;

iii. Award the Plaintiff punitive damages. *Bain v. City of Springfield*, 678 N.E.2d 155 (1997);

iv. Award the Plaintiff interest on the monetary damages along with the costs of maintaining this action, including costs and reasonable attorney's fees; and

v. Grant such other and further relief as the Court deems just and proper.

**SECOND CLAIM: DISABILITY DISCRIMINATION IN VIOLATION OF THE MASSACHUSETTS FAIR EMPLOYMENT PRACTICES ACT ("MFEPA") MASS. GEN. LAWS CHAPTER 151B AND OTHER STATE LAWS AND REGULATIONS**

92. Paragraphs 1 through 91 above of this Complaint are repeated and incorporated in this Second Claim as if fully set forth herein.

93. The Plaintiff is and was at all relevant times qualified to perform the essential functions of the position for which she was employed.

94. The Defendant was at all relevant times and is an employer as defined by Mass. Gen. Laws. Ch. 151B, §1 *et seq.*

95. The Plaintiff was at all relevant times a qualified handicapped individual as defined in Mass. Gen. Laws. Ch. 151B, §1 *et seq.* and/or the Defendant through its agents, servants, and employees perceived the Plaintiff to have a mental or physical impairment as defined in Mass. Gen. Laws. Ch. 151B, §1 *et seq.*

96. The Defendant's conduct, through its agents, servants, and employees violated the Plaintiff's rights under Mass. Gen. Laws. Ch. 151B, §1 *et seq.* and other state laws and regulations.

97. The Defendant violated Massachusetts Fair Employment Practices Act, Mass. Gen. Laws. Ch. 151B, §1 *et seq.*, and other state laws and regulations, when it wrongfully terminated the Plaintiff from her position on the basis of her disability or perceived disability; failed to provide reasonable accommodations; and subjected the Plaintiff to a hostile work environment.

98. As a direct and proximate result of the Defendant's violations, the Plaintiff, has incurred and continues to incur monetary damages including, but not limited to: loss of back and front wages; loss of earning capacity; loss of fringe benefits and pension

and retirement benefits; emotional distress; pain and suffering; loss of enjoyment of life; and mental anguish.

WHEREFORE, the Plaintiff requests that this Court award the Plaintiff damages for Defendant's violation of the Massachusetts Fair Employment Practices Act (disability), and other state laws and regulations, as stated in Second Claim, as follows:

i. Award the Plaintiff actual damages, including wages (back and front), salary, raises, cost of health insurance, seniority, vacation time, and other benefits lost;

ii. Award the Plaintiff monetary damages for emotional distress, pain and suffering, mental anguish, and loss of enjoyment of life;

iii. Award the Plaintiff liquidated and/or punitive damages;

iv. Grant the Plaintiff interest on the monetary damages along with the costs of maintaining this action, including costs and reasonable attorney's fees; and

v. Grant such other and further relief as the Court deems just and proper.

**PLAINTIFF REQUESTS A JURY TRIAL ON ALL CLAIMS.**

RESPECTFULLLY SUBMITTED,

**MARCELLA FRANCOIS**,
By her attorneys
//s// Constance A. Browne

_____

Constance A. Browne
BBO #061330
Boston Civil Litigation &
Justice Program
197 Friend Street,
Boston, MA 02114
(617) 603-1522
CBrowne@gbls.org

DATED: September 2, 2022